RECEIPT #
AMOUNT $ ___150___
SUMMONS ISSUED _Y-1_
LOCAL RULE 4.1 _____
WAIVER FORM _____
MCF ISSUED _____
BY DPTY. CLK. _____
DATE ___11-12-03___

## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| EVON YAMEEN, KENNETH YAMEEN, LISA YAMEEN, EDWARD L. MURPHY, JOHN H. DIAMOND JR., ELISE M. DIAMOND, JAMES W. YAMEEN, CRAIG J. MCLAUGHLIN, DEBORA J. MCLAUGLIN, MICHELLE YAMEEN, DOLORES BANAS, JOSEPH P. MCDONOUGH, MICHAEL J. MEEHAN, TERESA M. MEEHAN, JOHN E. MORRISSEY, THOMAS F. BEDNAREK, HOWARD W. MATHEWS, and LORRAINE BLACKER, | : Civil Action No. _____ <br> :: <br> :: <br> :: <br> :: **FEDERAL SECURITIES COMPLAINT** <br> :: <br> :: **JURY TRIAL DEMANDED** <br> :: <br> :: <br> :: <br> :: <br> :: <br> :: |
| Plaintiffs, | |
| v. | |
| PUTNAM INVESTMENT MANAGEMENT, LLC, | |
| Defendant. | |

# 03 ᶜᵛ 12222 RCL

MAGISTRATE JUDGE Bowler

Plaintiffs bring this complaint based upon information and belief, except for their own actions, which are based upon personal knowledge. Their information and belief are based upon the investigation of their counsel, which included a review of complaints filed by the Commonwealth of Massachusetts and by the United States Securities and Exchange Commission ("SEC") concerning the conduct at issue in this action, as well as of other regulatory filings and complaints, press releases and media reports.

## NATURE OF THE ACTION

1.      This is a direct shareholder action for violation of the Investment Company Act of 1940

("ICA"), 15 U.S.C. § 80a-1 *et seq.*  Defendant Putnam Investment Management, LLC ("Putnam") is the

investment advisor for the Putnam family of funds ("Putnam Funds"), a position it held during the relevant

time period complained of herein.  Putnam has entered into investment advisory agreements with each of

the funds, pursuant to which it has earned, and continues to earn, millions of dollars of fees each year.

Plaintiffs own shares in a number of the Putnam Funds, as detailed below.

2.      Putnam procured these lucrative agreements without disclosing that its senior executives

had been engaged in "market timing" transactions in fund shares, for their own personal benefit and for the

benefit of certain favored clients.  "Market timing" transactions are short-term trades in and out of a mutual

fund, for the purpose of exploiting idiosyncracies in the way mutual funds price their shares. Market timing

transactions benefitted individual managers of the funds, and Putnam's favored clients, at the expense of

the funds and the rest of their investors.  Since 1998, Putnam and its favored customers have reaped

millions of dollars of secret and illegal profits through these illicit transactions.

3.      Recent investigations by federal and state authorities have discovered not only that these

types of trades occurred, but also that Putnam senior management has been well aware of them since at

least 2000, but failed to stop them. Putnam also failed to notify the funds and their shareholders that such

trading was occurring. Instead, it continued to issue assurances that effective procedures were in place to

detect and prevent such trading.

4.      Section 15(a) of the ICA, 15 U.S.C. § 80a-15(a), requires that all investment advisory

contracts must contain a precise description of all compensation to be paid thereunder and be initially

approved by a majority of fund shareholders. The contracts can thereafter be extended either by vote of the board of directors of the fund or of the shareholders. Section 20(a), 15 U.S.C. § 80a-20(a), requires that all proxy statements issued must comply with the proxy rules issued by the Securities and Exchange Commission whose rules prohibit misstatements of material facts and failures to disclose facts that renders misleading the information that actually was disclosed. By misleading both the boards and the shareholders concerning the existence of "market timing" and other improper practices when it negotiated its advisory contract, Putnam violated section 20(a) of the ICA.

5.    Putnam also violated section 36(b) of the ICA, 15 U.S.C. § 80a-35(b). That provision imposes a fiduciary duty on investment advisors with respect to all fees earned by them and their affiliates and, at a minimum, required Putnam to disclose all material facts to fund directors concerning the competence and integrity of the individuals who would be managing fund portfolios, and concerning the sufficiency of procedures to assure proper management of each fund.

6.    Because the approval of defendant's investment advisory agreements was obtained in violation of the ICA, those agreements should be rescinded and/or declared unenforceable or void, pursuant to § 47(b) of the ICA, and all fees received during the past year should be refunded to the funds.

7.    The seriousness of Putnam's breach of trust can hardly be overstated. Both the SEC and the Secretary of State of the Commonwealth of Massachusetts have commenced actions. The Commonwealth filed an Administrative Complaint against Putnam and two of its employees on October 28, 2003. The SEC, that same day, filed a Complaint against those two same employees and instituted administrative proceedings against Putnam seeking relief in the form of a cease-and-desist order, disgorgement, penalties, and other equitable remedies. The New York State Attorney General has

announced that his office is also currently investigating the wrongs alleged here. The United States

Attorney's Office in the Southern District of New York has served a subpoena on Putnam and its affiliates

as well. Putnam's actions are part of a national scandal that is threatening to engulf the entire mutual fund

industry.

        8.     Since public disclosure of these practices starting on October 21, 2003, customers who

have been relying on Putnam for decades have been deserting the firm in droves.

- On October 31, 2003, *The Wall Street Journal* reported that New England Pension Consultants, an influential adviser, recently sent out an alert to 190 institutional clients telling them to terminate Putnam as an international stock fund manager and put all other Putnam products "on hold." Wilshire Associates, another institutional investor consultant, told clients it was likely to make the same recommendation, and Morningstar, Inc., is considering such a move as well.

- The office of Treasurer for the Commonwealth of Massachusetts has announced that it has fired Putnam as manager of $1.74 billion in its retirement plans, publicly stating that "we have to have confidence in the people we are paying large fees to manage our money and, at this point, we do not have that level of confidence in Putnam."

- New York, Vermont, Rhode Island, Iowa and Pennsylvania have all terminated their relationships with Putnam; and Connecticut, Oregon, Washington and Florida are considering terminating their relationship with Putnam as well.

- California State Treasurer Phil Angelides called on the California Public

Employees' Retirement System and the California State Teachers' Retirement System to terminate contracts with Putnam, which oversees $1.5 billion for the two pensions; according to Angelides: "Putnam has failed to meet the standards that we, as fiduciaries, should expect from a firm handling billions of dollars on behalf of pensioners and taxpayers."

• In all, over $10 billion dollars have been withdrawn from Putnam's charge in the less than two weeks since the wrongdoings were first disclosed, an amount and duration which Burton Greenwald, an industry consultant in Philadelphia, described as "unparalleled" and "extraordinary."

9.     Had defendant disclosed its improper activities to fund directors and shareholders, the boards and shareholders would have elected to terminate their relationship with Putnam and would have refused to approve or extend any further management contracts with Putnam.

10.     On November 3, 2003, Jeffrey W. Greenberg, Chairman and Chief Executive Officer of Marsh & McLennan Companies, Inc., the ultimate parent corporation of Putnam, announced the removal of Lawrence Lasser as President and Chief Executive Officer of Putnam, positions Lasser had held since 1986.

## JURISDICTION AND VENUE

11.     This Court has jurisdiction over the subject matter of this action pursuant to Sections 36(b)(5) and 44 of the ICA, 15 U.S.C. §§ 80a-35(b)(5), 80a-43; and 28 U.S.C. § 1331.

12.     Venue is proper in this District pursuant to Sections 36(b)(5) and 44 of the ICA, 15 U.S.C. §§ 80a-35(b)(5), 80a-43, since many of the acts took place in this District.

13.    Defendant, directly or indirectly, made use of the means and instrumentalities of interstate commerce, and of the mails, in connection with the acts, practices and courses of business alleged herein.

## PARTIES

14.    Plaintiff Evon Yameen owns units or shares of George Putnam Fund of Boston.

15.    Plaintiff Kenneth Yameen owns units or shares of Putnam Global Equity Fund.

16.    Plaintiff Lisa Yameen owns units or shares of Putnam Discovery Growth Fund.

17.    Plaintiff Edward L. Murphy owns units or shares of Putnam Voyager Fund.

18.    Plaintiffs John H. Diamond Jr. and Elise M. Diamond own units or shares of Putnam Money Market Fund.

19.    Plaintiff James W. Yameen owns units or shares of Putnam Growth Opportunities Fund.

20.    Plaintiff Craig J. McLaughlin and Debora J. McLauglin own units or shares of Putnam International New Opportunities Fund.

21.    Plaintiff Michelle Yameen owns units or shares of Putnam OTC & Emerging Growth Fund, Putnam International Equity Fund, and Putnam Discovery Growth Fund.

22.    Plaintiff Dolores Banas owns units or shares of Putnam Income Fund.

23.    Plaintiff Joseph P. McDonough owns units or shares of Putnam New Opportunities Fund.

24.    Plaintiff Michael J. Meehan and Teresa M. Meehan own units or shares of Putnam Massachusetts Tax Exempt Income Fund.

25.    Plaintiff John E. Morrissey owns units or shares of Putnam International Equity Fund.

26.    Plaintiff Thomas F. Bednarek owns units or shares of Putnam International Equity Fund.

27.    Plaintiff Howard W. Mathews owns units or shares of George Putnam Fund of Boston,

Putnam Fund for Growth and Income.

28.    Plaintiff Lorraine Blacker owns units or shares of George Putnam Fund of Boston, Putnam International New Opportunities Fund, Putnam OTC & Emerging Growth Fund, Putnam Voyager Fund II, and Putnam International Voyager Fund.

29.    Each of the funds, of which plaintiffs hold shares or units, identified above ("Plaintiffs' Funds") is a mutual fund that is regulated by the ICA and is managed by defendant Putnam, pursuant to investment advisory contracts.

30.    Defendant Putnam Investment Management LLC ("Putnam"), is a Massachusetts Business Trust registered in 1971 and an investment advisor under the Investment Advisers Act of 1940. Putnam is an indirect wholly-owned subsidiary of Putnam Investment Management Trust, which is an indirect wholly-owned subsidiary of Marsh & McLennan Companies, Inc. ("MMCI").    MMCI is a publicly-owned holding company traded on the New York Stock Exchange, whose operating subsidiaries are international insurance brokers, investment managers, and management consultants. Putnam is, and was during the relevant period, the investment adviser for the Putnam Funds and is the sub-adviser to 38 unaffiliated institutional portfolios. As of September 30, 2003, Putnam managed approximately $272 billion and has ultimate responsibility for overseeing the day-to-day management of the Putnam Funds. Putnam's headquarters are located at One Post Office Square, Boston, Massachusetts.

31.    Certain Putnam managers, although not defendants here, have been identified as being directly implicated in the improper transactions identified in this complaint.

(a)  Justin M. Scott was head of Small and Mid-Cap Core Fund and Small and Mid-Cap Growth Fund. He was also Portfolio manager of Vista Fund and Team member of Mid-Cap Growth Team

2.

(b) Omid Kamshad served as managing director and chief investment officer of International

Equities. He was Portfolio leader for the International Equity Fund and Europe Equity Fund; and team

member for International Core Team, International Growth Team and International Value Team.

(c) Geir Lode was Portfolio Manager of Global Core Equities.

(d) Carmel Peters was Director of Emerging Markets Equities and a team member of

International Core Team.

32.    On October 28, 2003, the Commonwealth of Massachusetts filed an administrative

complaint against Putnam, Scott and Kamshad, which accused them of engaging in a persistent pattern of

market timing Putnam's Voyager Fund, Europe Growth Fund, International Growth Fund, Global Equity

Fund and other Putnam Funds. It alleged that top management at Putnam knew about these trades but

"turned a blind eye and failed to take any remedial action." On the same day, the SEC filed two actions

in the District of Massachusetts, against these same two individuals and Putnam. Notably, the SEC charged

that Putnam, although well aware of these market timing violations since 2000, failed to provide this

information to any of the directors of the mutual funds Putnam was advising, who were being asked to vote

upon and approve the investment advisor agreements with Putnam.

## SUBSTANTIVE ALLEGATIONS

### Background

33.    A mutual fund is an investment company that pools money from many investors and invests

the money in stocks, bonds, short-term money-market instruments, or other securities. Shareholders

purchase mutual fund shares from the fund itself (or through a broker for the fund), but are typically not able

to purchase the shares from other shareholders on a secondary market, such as the New York Stock Exchange or Nasdaq. The price investors pay for mutual fund shares is the fund's per share net asset value ("NAV"), calculated by the fund each day, based on the market value of the securities in the fund's portfolio, plus any shareholder fees that the fund imposes at purchase (such as sales loads). Mutual fund shares are "redeemable," meaning that when mutual fund shareholders want to sell their fund shares, they sell them back to the fund (or to a broker acting for the fund) at the fund's NAV, minus any fees the fund imposes at that time (such as deferred sales loads or redemption fees).

34.    The investment portfolios of mutual funds are managed by separate entities known as "investment advisers" that are registered with the SEC. Investment advisers are retained by the mutual fund companies pursuant to a contract which, among other things, details the compensation to be provided by the fund to the adviser. *See* ICA § 15(a), 15 U.S.C. § 80a-15(a). These contracts must be approved by the vote of a majority of the outstanding voting stock of the fund. This is done at the appropriate time through the issuance by the fund of a proxy statement, indicating the need to engage in such a contract or, as the time might require, amend or renew the contract. The issuance of proxy statements is governed by the federal securities laws and the rules promulgated thereunder by the SEC. *See* ICA § 20(a), 15 U.S.C. § 80a-20(a). Advisory contracts can be extended either by vote of the fund's board of directors or by the shareholders of the fund. *See* ICA §15(a), 15 U.S.C. § 80a-15(a).

35.    A fund's investment adviser generally employs portfolio managers, who have discretion to buy and sell securities in the fund's portfolio. Portfolio managers must make investment decisions in accordance with the fund's objectives as stated in the fund's prospectus and cannot make investment decisions that are in their own interests rather than in the interests of the fund's shareholders. Portfolio

-9-

managers, as investment advisers, owe a fiduciary duty to fund shareholders of utmost good faith, and full and fair disclosure of all material facts.

### The Lure And Evils Of Market Timing

36.     Securities that trade on exchanges can change price at any time during the trading day, in reaction to relevant information as it becomes available. By contrast, mutual funds are priced only once per day, at 4:00 p.m. Eastern Time, at the close of the major New York markets. At that time mutual funds calculate their NAVs, based on the closing market prices of the securities held in the funds' portfolios. Many funds, and in particular many funds specializing in foreign stocks, calculate their daily prices hours after the closing of the foreign markets, many of which are in different time zones that may be 5-14 hours ahead of Eastern Standard Time. In some instances, information that may be highly relevant to the pricing of those foreign securities becomes available after those foreign markets have closed, but before 4:00 p.m. Eastern Time. In pricing fund shares for that day, the funds will use the hours-old closing prices of foreign shares held by the fund, even though it may by then be apparent that the price of those shares is likely to rise the following day.

37.     This situation creates an opportunity for sophisticated institutions and insiders to take advantage of this time lag by buying funds, at the current day's closing price, and selling them the following day or shortly thereafter, after the foreign market has reacted to the new information, bolstering the fund's NAV. Because shares traded on foreign markets close hours ahead of the New York markets, international funds are often the target of market timers. To be in a position to take advantage of market timing opportunities, however, an investor must know what foreign securities are heavily represented in a given fund's portfolio on any given day. Such information is typically available only to the managers of the

fund.

38.      Market timing is harmful to long-term fund shareholders, because it increases the fund's

transaction costs and siphons off a portion of the profits that otherwise would flow solely to those

shareholders. It can also disrupt the fund's stated portfolio management strategy, require a fund to maintain

an elevated cash position, and result in lost opportunity costs and forced liquidations. Short-term trading

can also result in unwanted taxable capital gains for fund shareholders and reduce the fund's long-term

performance. In short, market timing benefits a select few at the expense of the fund and all other fund

shareholders.

39.      Putnam was well aware of the evils of market timing. In 1996, in response to increasing

damage to the performance and value of its mutual funds by speculators, market timers and arbitrageurs,

Putnam formed an internal "Market Timing Department" ("MTD") whose mission, ostensibly, was to

prevent such occurrences. In March, 2003, the MTD issued a "Functional Narrative" that itemized many

of the evils of this practice. The memo summarizes that market timing

      a. Increases transaction costs associated with high levels of trading.
      b. May generate unwanted taxable capital gains distributions if fund managers are
         forced to liquidate holdings to meet redemption needs.
      c. May force fund managers to maintain higher cash positions.
      d. May disrupt stated portfolio management strategies.
      e. May take profits at the expense of long-term investors.

40.      As required by the Investment Company Act, Putnam had adopted a code of ethics

designed to obviate conflicts of interest between fund managers and the funds managed by Putnam. As

described in the Statement of Additional Information for Putnam Investors Funds, dated April, 29, 2003,

incorporated by reference into the prospectuses of a number of Putnam Funds, including all of Plaintiffs'

Funds:

> Employees of Putnam ... and officers and Trustees of the fund are subject to significant restrictions on engaging in personal securities transactions. These restrictions are set forth in the Codes of Ethics adopted by Putnam ... and by the fund (the Putnam Funds' Code of Ethics). The Putnam Investments' Code of Ethics and the Putnam Funds' Code of Ethics, in accordance with Rule 17j-1 of the Investment Company Act of 1940, as amended, contain provisions and requirements designed to identify and address certain conflicts of interest between personal investment activities and the interests of the fund.

> The Putnam Investments' Code of Ethics ... among other things, prohibits personal securities investments without pre-clearance, imposes time periods during which personal transactions may not be made in certain securities by employees with access to investment information, and requires the timely submission of broker confirmations and quarterly reporting of personal securities transactions. Additional restrictions apply to portfolio managers, traders, research analysts and others involved in the investment advisory process.

> . . . .

> The fund's Trustees, in compliance with Rule 17j-1, approved Putnam Investments' and the Putnam Funds' Codes of Ethics and are required to approve any material changes to these Codes.

41.    Thus, investors in the Putnam Funds were assured that personal trading by the fund manager and its employees was being strictly monitored to avoid conflicts of interest that might be injurious to the funds. That assurance was false.

## Market Timing By Putnam Fund Managers

42.    Contrary to the representations made by Putnam concerning strict enforcement of its "Code of Ethics," at least six Putnam employees were allowed to engage in market timing or short-term trading within Putnam's Funds. At least four of the employees were portfolio managers who held decision-making authority. These individuals who market timed the very funds they managed were Justin Scott, Omid Kamshad, Geir Lode, and Carmel Peters.

-12-

43.    Beginning in at least 1998, Justin M. Scott, Omid Kamshad,  Geir Lode and Carmel Peters

repeatedly implemented market-timing trading of Putnam Funds in their personal accounts.  Scott's trading

continued until at least mid-2000; Kamshad's trading continued into 2003.  These trades were in funds in

which these Putnam managers had access to non-public information regarding, among other things, current

portfolio holdings, valuations and transactions not readily available to all fund shareholders.

44.    Collectively, these four senior money managers timed traded in the following Putnam Funds:

Putnam Emerging Markets Fund (has since merged into Putnam International Equity Fund)
Putnam Asia Pacific Growth Fund (has since merged into Putnam International Equity Fund)
Putnam Asia Pacific Growth Fund II Fund(former incubated fund, has been liquidated)
Putnam International Capital Opportunities Fund (formerly Putnam International Voyager Fund)
Putnam International Equity Fund (formerly Putnam International Growth Fund)
Putnam Europe Equity Fund (formerly Putnam Europe Growth Fund)
Putnam Worldwide Equity Fund (former incubated fund, has been liquidated)
Putnam International New Opportunities Fund
Putnam International Fund 2000 (incubated fund)

45.    Until 2000, at least Scott's and Kamshad's short-term trading went unchecked by Putnam

altogether.

46.    Putnam's most senior managers, including Putnam President and CEO Lawrence Lasser,

found out about this trading in 2000. Yet they did not stop it, or disclose it.

### *Justin M. Scott's Timing Transactions*

47.    Scott was chief investment officer of the international equities group at Putnam. During the

relevant time period, he was a portfolio manager for at least five mutual funds whose portfolios contained

international securities. By virtue of those positions at Putnam, Scott had access to non-public information

regarding, among other things, current portfolio holdings, valuations and transactions not readily available

to all fund shareholders.

-13-

48.     Between 1998 and 2000, Scott engaged in approximately 35 short-term trades in Putnam

Funds, including funds he participated in managing. In 2000 alone, Scott engaged in at least 12 trades in

which he bought and sold mutual fund shares on consecutive days. As a result of his short-term trading,

Scott realized hundreds of thousands of dollars in gains. Scott often traded millions of dollars worth of

mutual fund shares for his own account.

49.     On February 18, 2000, Scott, a superior to Kamshad, was copied on a memorandum

regarding Kamshad's short-term trading. The memorandum, which addresses a warning given to Kamshad

in January 2000, made clear that short-term trading in large amounts was "inconsistent with our tolerances

for standard mutual fund clients." Indeed, as of March 2000, Putnam's Intranet advised employees, among

other things, that "[e]xcessive exchanges by a relatively small number of individuals among a number of

Putnam's funds have had a detrimental effect on the long-term shareholders of those funds."

### Omid Kamshad's Timing Transactions

50.     Kamshad was chief investment officer for international equity at Putnam since early 2002.

During the relevant time period, he was a portfolio manager for at least seven mutual funds whose portfolios

contained international securities. By virtue of these position at Putnam, Kamshad had access to non-public

information regarding, among other things, current portfolio holdings, valuations and transactions not readily

available to all fund shareholders.

51.     Between 1998 and 2003, Kamshad engaged in at least 38 timing transactions in Putnam

funds, including at least four funds he participated in managing. In these trades, Kamshad sold shares an

average of only 13 trading days after purchasing shares in a fund and often sold shares only three or fewer

trading days after purchases. Kamshad realized hundreds of thousands of dollars in gains. Kamshad

typically traded hundreds of thousands of dollars worth of fund shares and, on at least one occasion, the value of his short-term trade exceeded $1 million.

52.    In January 2000, senior Putnam executives in Putnam's retirement plan group learned of "large and frequent movement" of Putnam Funds by Kamshad, who at the time served as lead portfolio manager on Putnam's International Equity and Europe Equity Funds. On January 25, 2000, the director of Putnam's employee relations and staffing unit discussed with Kamshad his frequent trading, and Kamshad said he would cease that type and level of activity. On February 18, 2000, the director issued a memorandum to the file confirming this conversation.

53.    Following this discussion, Kamshad continued to engage in timing transactions in Putnam Funds. Between February and April 2000, Kamshad engaged in at least nine more of these transactions.

54.    Subsequently, in mid-2000, a senior executive at Putnam held a meeting with investment professionals in which he stated that Putnam employees must not engage in short-term trading in Putnam Funds. Kamshad, like other Putnam portfolio managers, attended this meeting. However, no procedures were put in place that would put a stop to such transactions. In fact, Putnam's review of managers' trading accounts was limited to one quarter per year, leaving the other 9 months totally unmonitored.

55.    Therefore, Kamshad was able to continue his timing transaction activity. Between August 2000 and September 2000, he made seven more of these transactions. For example, as recently as March 2003, Kamshad purchased more than $850,000 worth of shares in Europe Equity, a fund on which he was the lead manager. Four trading days later, he sold Europe Equity shares, garnering a profit of more than $79,000. In total, Kamshad engaged in at least 20 short-term round trip trades after he was warned about his conduct.

56.     The most senior managers at Putnam were aware of this activity by portfolio managers, yet did not take any disciplinary action against them, did not warn fund directors of this conduct, and did nothing to tighten the policing of this type of activity to assure that it would not recur. Management's feeble response did nothing to deter continued misconduct.

### Market Timing By Favored Clients

57.     Putnam's managers turned a blind eye not only to profiteering by its employees at the funds' expense, but also to the same type of conduct by favored clients as well – those with whom it had prospects of doing more lucrative business. Putnam allowed participants in three retirement plans to time Putnam Funds, in the expectation that such favored treatment would lead to other lucrative business opportunities for Putnam with these retirement plans and their members.

58.     Although senior management of Putnam was, once again, well aware of this activity, they never made an effort to stop it, and never disclosed it to either the board or the shareholders of any of the Putnam Funds, while continuing to solicit their approval of lucrative advisory contracts.

59.     In March of 2000 a Putnam review of trading activity in the Voyager Fund revealed that participants in one retirement plan, managed by Putnam, were doing a great deal of market timing transactions. In fact, by September of 2001, Putnam was receiving so many telephone trading orders from participants in the plan during between 3 and 4 p.m. that the hour became synonymous with that plan. When this information percolated up to the attention of "Putnam Retail Management," which had supposedly been organized to stamp out such trading, they refused to take any action.

60.     Action in this plan's account continued at a feverish pace. So much so that, on December 6, 2002, Putnam management had determined that 28 plan participants were accounting for 99% of the

-16-

exchanges in the International Voyager Fund, 99% of the International Growth Exchanges Fund, and 98% of the money market exchanges. Exchanges occur when shares in one fund are exchanged for shares in another fund in the same family; and this is a standard mechanism for carrying out market timing transactions. The plan participants also engaged in frequent exchanges between the Voyager Fund and the Stable Value Fund from at least 2000.

61.    Putnam's motivation in allowing this trading to continue was to secure other lucrative business from the plan sponsors. For example, in an e-mail dated March 17, 2003, Putnam employee Robert Gowdy explicitly stated how the scheme was instrumental in Putnam securing additional business from the retirement fund.

62.    On September 11, 2003, the Commonwealth of Massachusetts sent its first subpoena regarding market timing and mutual fund practices to Putnam. Shortly thereafter, Putnam finally took action by restricting the ability of plan participants to make transfers into the Voyager Fund. It did not, however, disclose the plan's timing activities.

63.    Putnam has also allowed rampant market timing by other plans' members, once again in order to secure other lucrative investment advisory business from them.

64.    In early 2000, for example, Putnam Dedicated Services Representatives at the Norwood office became aware that plan participants of one such other plan were making frequent exchanges between the Putnam New Opportunity Fund or Putnam OTC Emerging Growth Fund into the Putnam Stable Value Fund. These exchanges, into and out of these funds, were attempts at market timing the funds. Once again, Putnam did nothing to stop it or advise the funds or its shareholders as to what was going on.

-17-

### The Misconduct At Putnam Is Disclosed

65.     Putnam covered up the market timing of its employees and its key clients for years, and this coverup would be continuing to this day were it not for the investigations of the Commonwealth of Massachusetts and the State of New York.  It was not until October 21, 2003, that an article which appeared in the *Boston Globe* first revealed that Putnam was engaged in market timing activities.

66.     Then, on October 24, the Putnam Funds disclosed the existence of these timing trades. On that day it issued a press release that stated:

> The information available to us indicates that, although Putnam's systems and procedures have been effective in detecting and stopping the vast majority of attempts to market time Putnam funds in recent years, they have not been perfect. We now know, for example, of market timing activity in at least one 401(k) client account that was detected but not stopped in a timely manner. We have also learned of market timing activity in a small number of Putnam employee retirement accounts, most of which occurred, was detected, and was stopped by management in 2000. Unfortunately, this activity involved several investment professionals who traded in their own funds. These individuals are no longer involved in the management of your funds.

The stampede out of the Putnam Funds by huge institutional investors, including many public employee pension plans, started immediately.

67.     On November 3, 2003, Jeffrey W. Greenberg, Chairman and Chief Executive Officer of Marsh & McLennan Companies, Inc., the parent corporation of Putnam, announced the removal of Lawrence Lasser as President and CEO of Putnam.  The four money managers who timed funds of which they were in charge – Scott, Kamshad, Lode and Peters – were taken off their money managing duties, placed on leave and are scheduled to depart Putnam.  The other two Putnam employees were placed on leave.

## Putnam Funds' Trustees Are Too Conflicted To Act

68.     As of December 31, 2002, there were 101 funds in the Putnam family of funds which
comprise the Putnam Funds. Each of the 101 funds has a board of trustees whose function it is to oversee
the conduct of the fund's business. All 101 funds are identical in this respect, with the same thirteen person
board. The members of the board and their compensation for 2002 is as follows:

| No. | Name | Position(s) at The Putnam Funds | Salary for Putnam Funds Trusteeship[1] |
|---|---|---|---|
| 1. | Jameson A. Baxter | Trustee, since 1994 | $216,750 |
| 2. | Charles B. Curtis | Trustee since 2001 | $206,250 |
| 3. | John A. Hill | Trustee since 1985; Chairman since 2000 | $388,250 |
| 4. | Ronald J. Jackson | Trustee since 1986 | $207,250 |
| 5. | Paul L. Joskow | Trustee since 1997 | $203,750 |
| 6. | Elizabeth T. Kennan | Trustee since 1992 | $204,250 |
| 7. | John H. Mullin, III | Trustee since 1997 | $210,000 |
| 8. | Robert E. Patterson | Trustee since 1984 | $211,000 |
| 9. | W. Thomas Stephens | Trustee since 1997 | $203,250 |
| 10. | W. Nicholas Thorndike | Trustee since 1992 | $204,500 |
| 11. | Lawrence J. Lasser | Trustee 1992-03 | $1,000,000 (plus annual bonus of $7,000,000 and stock) |
| 12. | George Putnam, III | Trustee since 1984; President since 2000 | $253,000 |

---

[1] *See* Proxy for Putnam Master Income Trust, dated October 7, 2003. Lasser and Smith are paid directly for these and other services by MMIC directly. *See* Proxy for MMIC, dated May 15, 2003.

| 13. | A.J.C. Smith | Trustee since 1986 | $1,250,000 (plus incentive bonus of $1,250,000 and stock) |
|---|---|---|---|

69.    As a consequence of overseeing the business conduct of the 101 Putnam Funds, the board members are too conflicted, too distracted, and too overburdened to adequately and reasonably oversee the business operation of the Putnam Funds, including, Plaintiffs' Funds. The weight of their responsibilities has and continues to preclude adequate oversight with regard to the conduct of the funds and the funds' contractual relationship with its investment advisor and the appropriate compensation to be paid thereunder.

**COUNT I**

**(Violations of ICA § 36(b))**

70.    Plaintiffs incorporate by reference paragraphs 1-69.

71.    Although this cause of action is brought for the benefit of Plaintiffs' Funds, plaintiffs bring it directly as shareholders under ICA § 36(b), 15 U.S.C. § 80a-35(b).

72.    Section 36(b) creates a fiduciary duty on the part of all investment advisors, for the benefit of the funds they manage, in connection with the advisors' receipt of fees. This duty applies not only to the terms of the advisory fee agreements, but also to the manner in which advisors seek approval of such agreements. Thus, among other things, §36(b) prohibits advisors from soliciting the approval of any advisory agreement from a fund board by use of false or misleading information, or by failing to disclose information material to the board's decision regarding their compensation. Information concerning conflicts of interest is particularly important to the funds and to their independent directors.

73.    ICA § 36(b), 15 U.S.C. § 80a-35(b), creates a private right of action for all fund

-20-